IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 20, 2019 Session

## STATE OF TENNESSEE v. GLEN ALLEN DONALDSON

**Appeal from the Criminal Court for Hamilton County**
**No. 300677    Don W. Poole, Judge**

---

### No. E2019-00543-CCA-R3-CD

---

The defendant, Glen Allen Donaldson, appeals his Hamilton County Criminal Court jury conviction of second degree murder, arguing that the trial court erred by excluding certain evidence, admitting into evidence a life photograph of the victim, and denying the defendant's requested jury instructions on self-defense and provocation; that he was prejudiced by the cumulative effect of trial errors; that the evidence was insufficient to support his conviction; and that his sentence was excessive. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, and D. KELLY THOMAS, JR., JJ., joined.

Marya L. Schalk (on appeal), Jerry H. Summers (at trial and on appeal), Benjamin L. McGowan (at trial and on appeal), Chattanooga, Tennessee for appellant, Glen Allen Donaldson.

Herbert H. Slatery III, Attorney General and Reporter; Nick Spangler, Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams and Crystle Carrion, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Hamilton County Grand Jury charged the defendant with first degree murder arising from the shooting death of his son-in-law.

At the May 2018 jury trial, Hamilton County Sheriff's Office ("HCSO") deputy Joe Sanchez testified that, on December 29, 2016, he responded to a call that a person had been shot at 3997 Niles Terrace in Ooltewah. Inside the house, he found the

victim, Adam Levi, deceased and lying on the kitchen floor with a shell casing nearby. Several photographs of the crime scene were exhibited to Deputy Sanchez' testimony and shown to the jury. One photograph showed a dish drying rack to the left of the sink with a coffee press, a knife, and a lid. The defendant had reported the shooting and was apprehended at another location.

On cross-examination, Deputy Sanchez testified that, in the 9-1-1 call, the defendant had said that he had shot the victim after the victim threatened him with a knife. According to the victim's driver's license, he was five feet and 11 inches tall and weighed 210 pounds. Deputy Sanchez did not see the knife in the dishrack until sometime later when he reviewed the photographs of the scene.

On redirect examination, Deputy Sanchez stated that he did not find any signs of a struggle or altercation at the crime scene.

Sergeant James Gienapp, a crime scene investigator with the HCSO, processed the crime scene, taking photographs and collecting evidence. When he entered the house, he found the victim "laying on his back in the kitchen" with "a small amount of blood visible on his face. The faucet in the kitchen sink was running into a cup and there was a shell casing approximately a foot, foot and a half, to [the victim's] right shoulder." Sergeant Gienapp began a report on the case but wrote only a couple of paragraphs and did not include it in the official report. He finished writing the report only a couple of days prior to trial, explaining that he had lost the document from his computer when he changed computers. Several photographs taken by Sergeant Gienapp were exhibited to his testimony and shown to the jury. One photograph showed a knife in the dishrack pointing up with a lid to a travel mug resting on top of the knife handle. Although he had taken close-up photographs of the knife and dishrack, Sergeant Gienapp did not collect the knife into evidence because "[i]t did not appear to be relevant." He stated that he "knew very little" about the incident when he arrived at the scene, and he photographed the knife after Detective Ric Whaley asked about it. The shell casing he found was a "spent casing of Sig 30 auto, aluminum casing, silver in color."

During cross-examination, Sergeant Gienapp acknowledged that department policy required him to write a thorough and complete report "[a]round the time" of the incident. He also acknowledged that he did not use the Case Management System ("CMS") to write his report, explaining, "I usually do my narratives in Word because of spell check and things like that, and then I'll cut and paste the narrative over into the case file." Because he had not submitted his report in CMS, it was not part of the case file. In the report that he started writing shortly after the incident, he made no mention of the knife, but in the report he wrote a couple of days before trial he included

the knife found in the dishrack.

When he arrived at the scene, he had been told only that the defendant had shot the victim; he did not know of the defendant's allegation that the victim threatened him with a knife. Detective Whaley asked if there was a knife on the floor near the victim, and Sergeant Gienapp told him about the knife in the dishrack. At that point, he took the close-up photographs of the knife. He stated that he did not think that the knife was relevant because "with the lid laying on top of it, there is just no way that the knife was picked up prior to [the victim's] being shot." He acknowledged that the lid could have shifted if something had been dropped into the dishrack.

Hamilton County 9-1-1 Communications Records Specialist Jean Rogers took the defendant's call regarding the shooting. The jury heard a recording of the 9-1-1 call.

Former Collegedale Police Department officer David Myrick responded to the defendant's location at a Regions Bank after the shooting. The defendant exited his vehicle with his hands above his head as instructed and was taken into custody. Officer Myrick saw a semiautomatic handgun on the front passenger's seat of the defendant's truck. Photographs of the scene of the defendant's arrest were shown to the jury. The HCSO processed that scene, and the defendant's brother arrived during that time. Officer Myrick stated that the defendant was calm and compliant.

HCSO Sergeant Robin Langford responded first to the Niles Terrace scene where he "did a walk through" to "determine how much manpower, what type of equipment and logistics" would be necessary. He then went to the scene where the defendant was arrested. He found a semi-automatic Ruger .380 firearm in the defendant's truck. He took photographs, collected the gun, a magazine, and five rounds into evidence, and had the truck towed for processing. He did not write a crime scene report, explaining that "[in] this particular case with the vehicle, the photographs speak for themselves, the gunshot residue samples speak for themselves. There was no additional detail or clarification that led me to believe that further documentation was required."

During cross-examination, Sergeant Langford stated that, had the evidence needed more explanation, he would have written a report. He collected the gun and bullets from the truck before having it towed to avoid losing them.

Tennessee Bureau of Investigation ("TBI") Agent Jessica Hudson testified as an expert in firearm and toolmark identification. She concluded that the cartridge case

-3-

and bullet jacket recovered in this case were fired from the defendant's gun. At the request of the medical examiner, she generated "test patterns" of lead vapor of the defendant's gun fired from three, six, nine, and 12 inches. Photographs of the test patterns were shown to the jury.

On cross-examination, Agent Hudson stated that the ammunition in this case was the Sig brand. She agreed that the grains of gun powder in each cartridge by the same company "would vary slightly" and that this variance could slightly affect the results of her test patterns.

HCSO Detective Ric Whaley testified that he dispatched officers to the Niles Terrace and Apison Pike scenes, but because of a shortage of available officers that night, he acted as the case manager and conducted interviews. He did not respond to either scene himself, but was in contact with Detectives Gienapp and Langford. He met with the defendant at the sheriff's office. He also interviewed the defendant's brother, Jerry Donaldson, and Mr. Donaldson's wife. Detective Whaley determined to charge the defendant with first degree murder because the physical evidence at the crime scene "just didn't match the story" that the defendant told the 9-1-1 dispatcher. He stated that he did not know the victim prior to this case, but he identified the victim in a photograph taken while the victim was alive; the photograph was admitted into evidence and shown to the jury.

During cross-examination, Detective Whaley stated that there was never a question of whether the defendant shot the victim. The defendant had a handgun carry permit and was legally armed at the time of the shooting. Detective Whaley acknowledged that, in his report, he stated that no knife was found near the victim. He prepared his report from the information Sergeant Gienapp relayed to him. Although Sergeant Gienapp sent him a photograph of the "knife in the dish drainer with the lid on the handle," Detective Whaley did not consider the knife to be "in proximity as an offensive weapon."

On redirect examination, Detective Whaley explained that the physical evidence did not support the defendant's allegation that the victim threatened him with a knife, stating that based on the location of the gunshot, the victim "would have went straight back from wherever he was, which he went straight back from the sink. So he was facing the sink when he was shot."

On recross-examination, he acknowledged that the defendant told the 9-1-1 operator that the victim had "'turned around with a knife,'" and he agreed that the phrase "turned around" is vague and could mean that the victim turned all the way around or

-4-

simply turned to the side. He also acknowledged that if the victim was holding the knife over the dish drying rack at the time he was shot, the knife would have fallen into the drying rack, but he said, "I don't see how he would have put a lid on it after he was shot."

TBI Special Agent Carrie Schmittgen testified that traces of the victim's blood were found on the defendant's pants. On cross-examination, she stated that she did not receive a knife for serology testing in this case.

Doctor Steven Cogswell, Deputy Chief Medical Examiner at the Hamilton County Medical Examiner's Office, testified as an expert in forensic pathology. He performed the victim's autopsy and determined the cause of death to be a gunshot wound to the head. The victim's autopsy and toxicology reports were exhibited to Doctor Cogswell's testimony and shown to the jury. The toxicology report indicated that the victim had multiple prescription drugs in his system at the time of his death, including 234 nanograms per milliliter of Adderall, 173 nanograms per milliliter of hydrocodone, and 500 nanograms per milliliter of Tramadol. The report indicated a therapeutic range of 10-100 nanograms per milliliter for Adderall, 10-40 nanograms per milliliter for hydrocodone, and 200-750 nanograms per milliliter for Tramadol. The report also indicated the presence of caffeine, cotinine, and dihydrocodeine, which Doctor Cogswell attributed to "probably just a metabolite of the hydrocodone." The victim had prescriptions for 60 milligrams of Adderall, 10 milligrams of hydrocodone, and 400 milligrams of Tramadol per day.

Doctor Cogswell explained that a therapeutic range of a drug "is generally the lower and upper levels at which the drug is going to have a beneficial effect"; whereas a toxic range is "where it's having a bad effect on you"; and a lethal range is a dose "high enough that it could kill you." He also explained that a person can develop tolerance for a drug, which could require that person to "need more of the drug to have the beneficial effect." Consequently, "the therapeutic range for a particular individual who had been taking a drug for a long period of time may be significantly higher" than the therapeutic range for another individual. The victim had been taking hydrocodone and Adderall for "at least years." Doctor Cogswell did not attach any significance to the concentration of drugs in the victim's system because "absent any indication that his death is due to a drug overdose, there's simply nothing to say what [the victim] was acting like" or "what effect these drugs would have had on him at any given concentration."

The bullet entered through the back of the victim's head and lodged in his brain. Based on the soot and stippling patterns, Doctor Cogswell determined that the shot was fired from a close to intermediate range. After comparing the victim's wound to the

test patterns generated by Agent Hudson, he concluded that the victim was shot from three to four inches away.

During cross-examination, Doctor Cogswell estimated that the shooter was standing approximately a foot and a half away from the victim when the shot was fired. He reiterated that a therapeutic range of a particular drug can vary by individual, and he stated that the victim's concentration of 234 nanograms per milliliter of amphetamine could have resulted from his taking 60 milligrams of Adderall per day. Doctor Cogswell described Adderall as a stimulant that "tend[s] to raise blood pressure, make the system more alert and aware . . . [and] in the case of folks with ADD, it helps them focus." He acknowledged that it was classified as a drug with a high potential for abuse. Other potential side effects of Adderall were "assaultiveness, panic states, confusion, [and] hallucinations," but Doctor Cogswell explained, "That doesn't mean that every patient has those side effects." Doctor Cogswell acknowledged that the amount of hydrocodone in the victim's system was more than four times the highest listed therapeutic range but reiterated that "in the individual case, for the individual patient, again it can also be significantly higher." Doctor Cogswell described Tramadol as a non-morphine-based opiate that is used as a pain reliever for moderate to severe pain. The combination of Tramadol and hydrocodone would have had an "additive or synergistic" effect when taken together. Doctor Cogswell did not find anything in the victim's autopsy that would have warranted a prescription for hydrocodone and Tramadol to treat pain.

On redirect examination, Doctor Cogswell stated that he found no evidence that the victim was using illegal drugs, and he maintained that 60 milligrams of Adderall could result in a concentration of 234 nanograms per milliliter in a person. He also stated that because the victim used Adderall daily, he would have had some residual drug in his system from the previous day in order to prevent him from dropping below the therapeutic level.

Upon further cross-examination, Doctor Cogswell acknowledged that crushing or smoking Adderall as opposed to taking it by mouth would constitute abuse of the drug rather than a therapeutic use. He also acknowledged that he could not determine the victim's method of administration of the drug. He stated that "most forensic pathologists ignore what's listed on the therapeutic range" of a toxicology report because the report is only a snapshot of the patient's toxicology.

The State rested and the defendant elected to testify in his own defense.

The defendant testified that, at the time of the incident, he was employed at T & T Produce as a freight handler. The victim was married to the defendant's daughter,

Amanda Levi,[1] and they had one child, Olivia, together. The victim and Ms. Levi were going through a divorce, and, eight months prior to the shooting, Ms. Levi and Olivia had moved in with the defendant's parents. The defendant stated that he tried to act as a mediator between Ms. Levi and the victim during the divorce and that his relationship with both of them was very good, saying that he loved the victim "like a son. I mean, he was one of my kids."

At some point during the divorce proceedings, a court order prohibited the victim from being alone with Olivia and from visiting her without Ms. Levi's consent. On Christmas Eve 2016, the defendant texted the victim about Ms. Levi's meeting with the victim's parents and discussing "everything that had been going on through their divorce, the issues." The victim and Ms. Levi then began "ya-ya-ing between each other," and the victim "want[ed] to bump them gums, just to push the button." The defendant was "irritated" with them and texted the victim, "This is a bunch of bull, stop it. I hope you have a Merry Christmas." The next day, the victim came to the defendant's parents' house to see Olivia for Christmas. The defendant stated that he and the victim had no problems at that time.

On the day of the shooting, December 29, the defendant visited with Olivia at his parents' house between 5:30 p.m. and 6:00 p.m. He returned to his house between 7:00 p.m. and 7:30 p.m. when he received a text message from the victim stating that the defendant could come over to pick up some bed rails for Ms. Levi. He arrived at the victim's house about 20 minutes later and knocked on the door, and the victim invited him in. When he entered the house, the victim was washing dishes in the kitchen, and the defendant "went over to the dining room area adjacent to the kitchen area" and sat down. The two talked while the victim continued to wash dishes. The defendant described the victim as being "real shaky," "jittery," and "talking a hundred miles an hour." The victim told the defendant that he was "okay, I've got something to keep me going." The two men then loaded the bed rails into the defendant's truck, and the victim invited the defendant back into the house, saying, "[M]an come on back up, [w]e ain't seen each other." They returned to the kitchen and continued to talk. The defendant stated that, in the prior year, the victim had lost several jobs and was, at that time, working for his brother at Everclear Pool. The victim's house was in foreclosure, and Ms. Levi "was keeping him going" financially.

At some point, the conversation became more serious and the defendant

---

[1]     Although the trial transcript does not contain Ms. Levi's last name, the presentence report identifies her as Amanda Levi, and we will refer to her as Ms. Levi here. Because we presume Olivia's last name to also be Levi, we will refer to her as "Olivia" to avoid any confusion.

asked the victim about certain text messages related to drug purchases and drug dealings. Prior to that, the victim was unaware that Ms. Levi had obtained these text messages through a private investigator. When the defendant brought up these messages, the victim seemed "[v]ery much surprised," "[h]is whole demeanor started changing," and he looked as if he had "got[ten] busted." The defendant told the victim that Ms. Levi intended to use the messages against the victim in the divorce and custody proceedings. The defendant said that his intent was to help the victim deal with his drug issue. The defendant stated that the victim "was just mad. Not at me. He was mad. His world was coming to an end, everything was catching up." The victim was at the sink and was holding a knife, and when the defendant warned him that he did not want the other person on the text messages to be subpoenaed during the divorce proceedings, the victim "turned and he twisted, and he said 'I promise you that ain't going to happen.'"

When that moment passed, the defendant told the victim that Ms. Levi had met with the victim's parents and that she had talked with them about trying to get the victim some help. The victim replied, "Well, that's where the F-ing questions come from, I wondered how they knew." The defendant said that this was unusual behavior for the victim. The defendant left the room to use the restroom, and when he returned to the kitchen, the victim was standing at the sink. The defendant walked up behind the victim and asked him about his drug use and a "very upsetting family situation." The defendant described what happened next:

> [W]hen I asked him, it was F-U, you SOB, and I seen a handle come up and I seen the chrome and I knew. And he said, I'll cut you. And I stepped behind him. I wasn't there far behind him, you know, I'd just walked in there. And I pulled -- when he told me he was going to cut me, I had a pistol in my vest and I pulled it, and I turned, I didn't know where I shot. I remember some bang and the smell of smoke. I didn't know where I shot.

After shooting the victim, the defendant "sat there for a minute . . . trying to figure out what to do, and I left and got in my truck and I called my big brother," Jerry Donaldson. He told his brother to call 9-1-1 because he had shot the victim after "[w]e got in a confrontation." The defendant then drove to the Regions Bank approximately two to three miles away and told his brother to tell the police he would wait there and that "[t]here will be no problems." The defendant then called 9-1-1 himself. The defendant stated that, during the call, he sounded calm because he "was in shock. I don't get excited, I stay calm." When the 9-1-1 operator asked him if the victim was still alive, he responded, "I doubt it." The defendant said he was "trying to compress it into what had

-8-

just transpired," and he did not want to acknowledge the possibility of what had happened.

The defendant stated that he did not flee when he saw the victim raise the knife because he "was in fear of what was going on. And my mobility at that time wasn't good because I'd had neck surgery, . . . and I couldn't move good." The defendant stated that he "was just trying to get out of the situation. And when I was in fear of everything and a man tells me he's going to cut me, and he was mad, I pulled my gun."

On cross-examination, the defendant denied that he was trying to provoke the victim with his questioning about his drug use. Rather, he was trying to help the victim. The defendant clarified that, when he returned to the kitchen from the restroom, the victim was standing at the sink, and the defendant stood not "that far from him" "off his left shoulder." He estimated that he was a foot to a foot-and-a-half away from the victim. When the victim picked up the knife, the defendant "stepped behind him, pulled [the gun] out of my vest and turned." The defendant was moving "[t]oward the refrigerator area" and "toward the stove." He estimated that, when he fired the gun, the victim was at "[a]rm length, then some, I guess." The victim did not turn all of the way around when the defendant fired.

The jury heard an audio recording of a jail-house phone call between the defendant and his brother following the defendant's bond hearing, during which call the defendant told his brother that he had been "pushing the button on [the victim's] drug issues," but the defendant maintained that he was trying to help the victim. He again denied that he had been trying to provoke the victim. The defendant agreed that it was impossible to shoot a person in the back of the head when they are facing you. The text message that the defendant sent to the victim on December 24 was read into the record: "Adam, it's Glenn. Amanda just sent me your text. Didn't like it, so I told her Olivia not coming today. Sorry. Come see her in the morning. Problem solved. Ask your parents about the secret lunch they had with Amanda and talk they had with her. I'm over this bull. Have a Merry Christmas." The defendant explained that the "bull" the text was referring to was the "yayaing" between Ms. Levi and the victim. He denied that there was a struggle or fight between him and the victim, and he stated that he had not been injured during the shooting.

During redirect examination, the defendant agreed that the term "turned around" could indicate various types of movement including turning all of the way around or turning only part of the way around. He stated that the victim turned to his left when he "turned around" with the knife. He stated that he could have been five feet away from the victim when he shot him but "everything was a guess what went on that night in

-9-

that room." He stated that he had been frustrated with the victim's drug use because it was negatively impacting Olivia, stating, "Olivia was getting short-changed, I wanted to make sure she didn't." He thought that if the victim could get over his drug problem, then Ms. Levi "would calm down" and the situation would improve.

During the jail-house phone call with his brother, the defendant stated that he had asked the victim about his and Ms. Levi's son, Gabriel, who was stillborn at 22-weeks gestation.. Specifically, the defendant asked the victim whether his drug use had resulted in certain injuries to Gabriel that had caused his death. The defendant contended that his questioning the victim about Gabriel resulted in the victim's threatening him with the knife. In that same phone call with his brother, the defendant stated that he had also asked the victim about a drug dealer named "Willie."

On recross-examination, the defendant stated that the victim was a good father to Olivia. He acknowledged that the victim had never caused any physical harm to Gabriel.

The defendant presented three character witnesses, Mark Anthony Hughes, James H. Wright, Jr., and Arthur Cofield, each of whom testified that he knew the defendant to be a truthful person and would believe any testimony of the defendant given under oath.

Harold Donaldson, the defendant's father, testified that he was a retired police officer. He explained that Gabriel was the stillborn child of the victim and Ms. Levi and that when Gabriel's condition became known, Ms. Levi had to continue to carry him for approximately seven more months to delivery. He stated that Gabriel's death was a shock to the entire family and that the victim and Ms. Levi both cared for Gabriel.

Mr. Donaldson stated that, on the day of the shooting, the defendant came over to his house around 5:30 p.m. and stayed "for a little while with us and said he had to leave, go meet [the victim] to get two bed rails." He said the defendant was acting "[j]ust like normal, just his normal doings." Mr. Donaldson had last seen the victim on Christmas day when he came to visit Olivia. Mr. Donaldson had never seen the defendant acting hostile toward the victim, stating, "They always seemed to get along real good the whole time I knew [the victim]."

On this evidence, the jury found the defendant guilty of the lesser included offense of second degree murder. After a sentencing hearing, the trial court imposed a sentence of 20 years' incarceration. Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal.

In this appeal, the defendant argues that the trial court erred by excluding or limiting certain evidence, by admitting a life photograph of the victim, by rejecting his request for special jury instructions on the issues of self-defense and adequate provocation; that he was deprived of his right to due process and a fair trial by the cumulative effect of the trial court's errors; that the evidence was insufficient to support the conviction; and that his sentence is excessive. We will address each issue in turn.

## I. Exclusion of Certain Evidence

The defendant contends that the trial court erred by limiting evidence of text messages between the victim and his alleged drug dealer, "Willie," excluding evidence of the defendant's requesting a wellness check after the victim threatened suicide, and limiting evidence regarding the defendant's asking the victim if his drug use contributed to the deformities of the victim's stillborn child. The State argues that the trial court did not err.

In testimony proffered during a jury-out hearing, the defendant stated that he had learned about text messages between the victim and a drug dealer named Willie and that, when he told the victim that he knew about these messages, the victim's "whole demeanor started changing." When the defendant asked the victim who Willie was, the victim "just got quiet for a minute." The defendant then told the victim that he had seen the text messages, and he said to the victim, "Come on man, don't do this, you don't want some drug dealer . . . to be subpoenaed to your divorce hearings." The defendant testified that, as part of the divorce proceeding, the victim had been ordered to submit to a drug hair test, but the victim shaved his head before the scheduled test and the lab "couldn't pull any body hair." At some point later, the victim submitted to the test and passed.

On cross-examination, the defendant stated that the text messages in question were at least eight months old. The defendant said that he knew the victim was upset when he started cursing because that was unusual behavior for him. The defendant had asked the victim "if he thought that these drugs had anything to do with the deformities of Gabriel," the victim's stillborn son. Upon the defendant's asking the victim about Gabriel, "the knife and the gun and everything came into the picture."

The defendant also made an offer of proof of the defendant's 9-1-1 call in which he requested a wellness check on the victim after the victim had indicated suicidal thoughts. The parties stipulated to the facts contained in a police report of the incident.

The trial court determined that the defendant could testify to his

-11-

confronting the victim with his knowledge about the text messages that concerned "something about drugs" but ruled that the content of the messages and the use of Willie's name was unduly prejudicial. The court also determined that evidence of the defendant's asking the victim if his drug use contributed to Gabriel's deformities was prejudicial with "very little probative value." The court allowed the defendant to present evidence that the victim and Ms. Levi "had a child that died shortly after birth" and that he had asked the victim about the child's death, but the court concluded that the defendant could not testify to the exact question he had asked the victim regarding the child. Finally, the trial court concluded that evidence of the victim's threatening suicide and the defendant's request for a wellness check was irrelevant.

Although "[p]rinciples of due process require that a defendant in a criminal trial have the right to present a defense and to offer testimony" favorable to his cause, *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000)), that right is not without limits, *see id.* (citing *Chambers*, 410 U.S. at 302). Indeed, the Supreme Court has observed that "[i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence." *Chambers*, 410 U.S. at 302. "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Flood*, 219 S.W.3d at 316 (citing *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Chambers*, 410 U.S. at 302). To determine whether a particular evidentiary ruling has violated a defendant's constitutional right to present a defense, a reviewing court must consider:

> (1) Whether the excluded evidence is critical to the defense;
>
> (2) Whether the evidence bears sufficient indicia of reliability; and
>
> (3) Whether the interest supporting exclusion of the evidence is substantially important.

*Flood*, 219 S.W.3d at 316 (citing *Brown*, 29 S.W.3d at 434-35; *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

Here, we cannot say that the trial court erred by excluding or limiting the evidence in question. Reviewing this decision against the criteria set forth in *Flood*, we find that the excluded evidence was not critical to the defense. Indeed, the defendant was

-12-

permitted to testify on redirect examination that he had asked the victim about a drug dealer named Willie and whether the victim's drug use had resulted in certain injuries that caused Gabriel's death after the State opened the door to this evidence. The only evidence related to these issues that the jury did not hear was the specific content of the text messages and that Gabriel suffered some sort of deformity. Otherwise, the jury heard evidence that the defendant confronted the victim with text messages about drug deals and questioned the victim about whether his drug use caused Gabriel's injuries and death. Consequently, the excluded evidence was not critical to the defense.

Similarly, we conclude that evidence of the defendant's seeking a wellness check for the victim was not critical to his defense. That the defendant cared about the victim and that the two had a good relationship was uncontroverted. Additionally, the defendant's chief defense was that he acted in self-defense, and a previous request for a wellness check does nothing to bolster that theory. Accordingly, the defendant is not entitled to relief on this issue.

## II. Life Photograph of Victim

The defendant next asserts that the trial court erred by admitting into evidence a photograph of the victim while alive, arguing that the statute under which the photograph was admitted is unconstitutional.

As relevant here, Code section 40-38-103(c) provides: "In a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney general to show the general appearance and condition of the victim while alive." T.C.A. § 40-38-103(c).

The defendant contends that the statute intrudes upon the purview of the judiciary by usurping the trial court's authority to determine the admissibility of evidence by making life photographs per se relevant and admissible in homicide cases. The State asserts that the statute preserves judicial discretion relative to the admissibility of life photographs by providing that only an "*appropriate* photograph . . . shall be admissible." *See id.* (emphasis added). We agree with the State.

As our supreme court has stated, "[w]hen a statute may be given more than one reasonable interpretation, and one construction would render the statute constitutional and one would not, we must choose that construction which validates the provision." *Mitchell v. Mitchell*, 594 S.W.2d 699, 702 (Tenn. 1980). Accordingly, "[w]e will not declare a statute unconstitutional when we are reasonably able to do otherwise to preserve its meaning and purpose through a constitutionally correct construction." *Id.*

The Tennessee Constitution directs that "[n]o person or persons belonging to one of [the three distinct departments of government] shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." Tenn. Const. art. II, § 2. As our supreme court has previously recognized, "[o]nly the Supreme Court has the inherent power to promulgate rules governing the practice and procedure of the courts of this state, and this inherent power 'exists by virtue of the [Constitution's] establishment of a Court and not by largess of the legislature.'" *State v. McCoy*, 459 S.W.3d 1, 9 (Tenn. 2014) (quoting *State v. Mallard*, 40 S.W.3d 473, 480-81 (Tenn. 2001) (alterations in *McCoy*)). However, "[a] legislative enactment which does not frustrate or interfere with the adjudicative function of the courts does not constitute an impermissible encroachment upon the judicial branch of government." *McCoy*, 459 S.W.3d at 9 (quoting *Lynch v. City of Jellico*, 205 S.W.3d 384, 393 (Tenn. 2006) (alteration in *McCoy*)). Consequently, legislative rules of evidence will be upheld "so long as they '(1) are reasonable and workable within the framework already adopted by the judiciary, and (2) work to supplement the rules already promulgated by the Supreme Court.'" *McCoy*, 459 S.W.3d at 9 (quoting *Mallard*, 40 S.W.3d at 481).

Although the statute in question mandates the admission of "an appropriate photograph of the victim while alive," the admission of such photograph is limited to certain cases and for certain purposes. *See* T.C.A. § 40-38-103(c). By the plain language of the statute, the trial court retains the discretion to determine whether a life photograph of a homicide victim is appropriate for admission. *See id.* Despite the statute's mandatory language, a trial court may nevertheless exclude a photograph, even if relevant to show the victim's "general appearance and condition . . . while alive," *see id.*, if the court determines that "its probative value is substantially outweighed by the danger of unfair prejudice," *see* Tenn. R. Evid. 403. Such a photograph would be inappropriate and, consequently, excludable under the statute. *See* T.C.A. § 40-38-103(c).

The photograph at issue here shows the victim standing alone in a suit and smiling at the camera. Although the victim's identity was not at issue in this case, the photograph is relevant to show the victim's general appearance while alive, and nothing in the photograph is prejudicial to the defendant. Accordingly, the trial court did not err by admitting the life photograph of the victim.

### III. Self-Defense and Provocation Instruction

The defendant asserts that the trial court erred by denying his requests for special jury instructions on self-defense and adequate provocation. Specifically, the defendant alleges error, not in the content of the self-defense charge given, but rather in

the placement of the charge in the instructions. The defendant contends that the trial court should have given the self-defense instruction as an element of the charged offense and of each lesser included offense. Additionally, the defendant argues that the trial court erred when it failed to provide a definition to "adequate provocation" in response to a question from the jury.

In criminal cases, a defendant has the right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). Thus, it follows that the trial court has a duty to give a complete charge of the law applicable to the facts of a case. *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). The failure to do so deprives the defendant of the constitutional right to a jury trial. *Garrison*, 40 S.W.3d at 432. In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). Notably, when jury instructions fully and fairly state the applicable law, a trial court is not required to provide special instructions. *State v. Mann*, 959 S.W.2d 503, 521 (Tenn. 1997); *State v. Kelley*, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984).

Although the defendant may request special instructions, jury instructions are sufficient where they adequately state the law. *See, e.g., State v. Tyson*, 603 S.W.2d 748, 755 (Tenn. Crim. App. 1980). When a trial court's charge to the jury is complete, it need not give additional special instructions requested by the defendant. *See State v. Story*, 608 S.W.2d 599, 603 (Tenn. Crim. App. 1980).

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

Here, before enumerating the elements of the charged offense and each lesser included offense, the trial court provided the following charge to the jury: "To convict the defendant of the charged offense or a lesser-included offense, the State must have proven beyond a reasonable doubt . . . all of the elements of the offense . . . , [and] that the defendant did not act in self-defense." After enumerating the elements of the charged offense and each lesser included offense, the trial court gave the following self-defense instruction:

Included in the defendant's plea of not guilty is his plea of self-defense. A person has a right to use force against another when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person has no duty to retreat before using force.

A person has a right to use force intended or likely to cause death or serious bodily injury if: One, the person has a reasonable belief that there is an imminent danger of death or serious bodily injury; and two, the danger creating the belief of imminent death or serious bodily injury is real or honestly believed to be real at the time; and three, the belief of danger is founded upon reasonable grounds.

The person has no duty to retreat before using force likely to cause death or serious bodily injury.

In determining whether the defendant's use of force was reasonable, you may consider not only his use of force, but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there was reasonable grounds for the defendant to fear death or serious bodily injury from the alleged victim include but are not limited to: One, any previous threats of the alleged victim made known to the defendant; two, the character of the alleged victim for violence when known to the defendant; three, the animosity of the alleged victim for the defendant, as revealed to the defendant by previous acts and words of the alleged victim; and four, the manner in which the parties were armed and their relative strengths and sizes.

If proof was offered by the defendant of a trait of character of the alleged victim to show that the alleged victim was the first aggressor and proof was then offered by the State of a trait or character of the defendant to show that the defendant was the first aggressor, such proof offered by the State for that purpose can only be considered by you for the purpose of its effect, if any, in rebutting the defense proof that the alleged victim was the first aggressor and that, therefore,

-16-

the defendant acted in self-defense. It cannot be considered by you as evidence of the defendant's predisposition to commit the offense for which he is now on trial.

The use of force against the alleged victim would not have been justified if the defendant provoked the alleged victim's use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the alleged victim the intent to do so and the alleged victim, nevertheless, continued to use unlawful force against the defendant.

If evidence is introduced supporting self-defense, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense.

If from all the facts and circumstances you find that the defendant acted in self-defense, or if you have reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

During deliberations, the jury asked the trial court the following question: "Define adequate provocation. And can you provoke with words or in action?" The defendant submitted a special request for the court to provide the following response to the jury's question: "I charge you that words or action by the decedent can provide adequate provocation if it places the defendant in apprehension of immediate bodily harm." The court declined to provide the defendant's requested instruction to the jury after concluding that it could not determine from the jury's question whether they were asking about provocation by the victim in the context of voluntary manslaughter or provocation by the defendant in the context of self-defense. The court responded to the jury, "Please review all of the instructions. The questions you ask are basically questions for the jury to decide, but if you can be more specific in what context your questions are directed, possibly more assistance can be given." The jury returned a verdict without asking any follow-up question.

The trial court's instruction on self-defense closely tracked the language of the Tennessee Pattern Jury Instructions, *see* Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 40.06(b), and was consistent with the self-defense statute, *see* T.C.A. § 39-11-611(b), (e)(2). Because the trial court's jury instruction on self-defense was complete and accurate, the court was not obligated to give the special instruction requested by the

-17-

defendant. *See Story*, 608 S.W.2d at 603. Additionally, although the trial court did not define adequate provocation or answer the jury's question, the court gave the jury an opportunity to clarify its request for information, but the jury declined to seek further explanation on the matter. We conclude that the trial court did not err by declining the defendant's requests for special instructions or by declining to answer the jury's question about adequate provocation without more context.

## IV. Cumulative Error

The defendant argues that the cumulative effect of the errors raised above deprived him of a fair trial and due process. Having considered each of the above issues and concluded that the defendant is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed . . . .").

## V. Sufficiency of the Evidence

The defendant contends that the evidence was insufficient to support his conviction for second degree murder and that the State failed to negate the defense of self-defense.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As relevant to this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210(a)(1). Self-defense, however, "is a complete defense to crimes of violence." *State v. Ivy*, 868 S.W.2d 724 (Tenn. Crim. App. 1993). The Code defines self-defense, in pertinent part, as follows:

(b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

    (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

    (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

. . . .

(e) The threat or use of force against another is not justified:

(1) If the person using force consented to the exact force used or attempted by the other individual;

(2) If the person using force provoked the other individual's use or attempted use of unlawful force, unless:

    (A) The person using force abandons the encounter or clearly communicates to the other the intent to do so; and

    (B) The other person nevertheless continues or attempts to use unlawful force against the person[.]

T.C.A. § 39-11-611(b), (e)(1)-(2).

The evidence adduced at trial, considered in the light most favorable to the State, established that the defendant went to the victim's house and shot the victim in the back of the head at a range of three to four inches while the victim was washing dishes. The defendant admitted shooting the victim, and, although the defendant testified that he shot the victim in self-defense after the victim threatened him with a knife, the State presented evidence that contradicted the defendant's testimony. Sergeant Gienapp testified that the knife's location in the dishrack with a lid placed on top of the handle indicated that the victim was not holding the knife at the time he was shot. Detective Whaley also testified that the physical evidence at the scene did not support the defendant's story. The jury resolved any issues of witness credibility and evidentiary weight, as was their prerogative. *See Cabbage*, 571 S.W.2d at 835 (Tenn. 1978). We hold that this evidence was sufficient to support the defendant's conviction of second degree murder and to overcome the defendant's claim of self-defense.

## *VI. Sentencing*

Finally, the defendant contends that his 20-year sentence is excessive, arguing that the trial court gave undue weight to the enhancement factor. The State argues that the trial court did not err.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)).

As relevant here, a conviction of second degree murder, a Class A felony, for a Range I offender carries a sentencing range of 15-25 years. *See* T.C.A. § 40-35-112(a)(1). Here, the record reflects that the trial court considered all appropriate principles set forth in Code section 40-35-210(b). *See* T.C.A. § 40-35-210(b). The trial court found one enhancement factor: that the defendant used a firearm in the commission of the offense, *see* T.C.A. § 40-35-114(9), noting, "[I]t's a strong enhancing factor[] . . . in regard to this case." As to mitigating factors, the trial court found that the defendant

-20-

did not "have a criminal record, he has a loving, supporting family," and he had "an excellent work history." *See* T.C.A. § 40-35-113(13). The trial court found that the enhancing factor "overwhelms the mitigating factors," giving "some credit" to the mitigating factors but giving "a lot of credit, a lot of credit, to that very strong enhancing factor that a firearm was taken in that man's house and he was shot in the back of the head at a distance of three to four inches." "A trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). For this reason, an appellate court is precluded from reweighing appropriately applied enhancement and mitigating factors. *See id.* at 344-45. Accordingly, we find no error in the trial court's refusal to attach more weight to the mitigating factors, and we conclude that the record supports the length of sentence imposed in this case.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE